Lipscomb, J.
This was a suit to recover a certain tract of land. The plaintiff claimed title by virtue of a location and survey of a land certificate. Among other defenses, the defendants relied upon title derived from Maximo Sanches, under a grant to him from the State of Coahuila and Texas. There was a verdict aud judgment for the defendants.
*291 The main controversy arises upon the validity oí the grant to Sanches; and if his title is good, tlie title derived from him by tlie defendants is not controverted.
Tlie plaintiff alleges that tlie court erred—
“In permitting the pretended grant to M. Sanches to be read to the jury “ without showing the authority of tlie commissioner, De Leon, and the admission as a colonist of the grantee by the empresario;” and this is liis first assignment of error.
The appellant, under tlie first assignment, has made two points in his brief. First, that the commissioner had no authority to extend titles to the land in question,because it was not embraced within the empressaof Martin DeLeon, and that it was within the ten littoral leagues; and secondly, there was no evidence that Maximo Sanches had been received as a colonist by the em-presario.
Tlie first assumes that De Leon, the empresario, was not authorized by the State Government and tlie Executive of the General Government to colonize the coast leagues, that is, the territory lying within ten leagues of the Gulf of Mexico. The documentary evidence is not very clear as to the time when De' Leon acquired a right to colonize tlie littoral leagues, nor are the precise boundaries of his contract well defined. His claim, however, is founded on his second or extension contract of-. It is shown, conclusively, that the controversy between De Leon and Power was in relation to the coast leagues, and it couid not have arisen upon any other parts or portions of their claims, because Power’s contract was for the coast leagues and' no others; and, therefore, without De Leon’s claim embracing also the coast leagues, there could have been no collision between them. The boundary of Power’s claim running upon a line ten leagues from tlie coast., eastwardly, did not interfere with De Leon until it crossed Coleto. De Leon claimed the Coleto as his boundary to the west, and down the same to the Guadalonpe, and all then between the Guadaloupe and the Lavaca. It seems pretty clear that the coast leagues, as far east as Lavaca, were embraced in tlie contract with Power. His proposition was to colonize all tlie coast leagues from the Nueces to the Sabine. He was confined east of the Lavaca. But whether De Leon had an older and better claim for that portion in dispute, we have not the means, if it was within onr province, to decide. His claim received at different terms the construction of both the State and Federal authorities. The State authority, though recognizing the contract of De Leon, gave a preference to Power’s, as being tlie better claim; and so, perhaps, it would have rested, but for the representation made by General Teran to tlie Federal Executive. He seems to have assumed the right of interference, as the highest military officer, because the disputed territory was within the coast leagues, and he gave the preference to De Leon, which received tlie approbation of the Federal Executive, and was communicated officially to tlie State Executive. From the time of this preference of the claim of De Leon by the Federal Executive being communicated to the State Executive, the latter seems to have taken the adjustment of the controversy into his own hands; aud it is shown by documentary and oral evidence that, under the authority of the State, De "Leon was put into the possession of the disputed territory and Power was excluded from it. It was in evidence that-tlie boundaries between the two empresarios were settled by the political chief ; and that Power and the commissioner for extending titles acquiesced in this settlement, is to be inferred from the fact that no titles were extended to his colonists within the bounds prescribed as belonging to De Leon. At any rate, there is nothing before us from which it can be inferred that there was any further controversy, and Power and Hewitson, if not satisfied, submitted to the decision.
After a protracted controversy we find De Leon in possession as empresario of the debatable ground by the action of the State Government. Is it shown that he is there with the approbation of the Federal Executive? Of that there can be no doubt. We have it from the archives of the Government, *292 officially communicated to tlie State Executive from the Federal Executive. Wo have ruled in several cases that to authorize the granting of land lying within the littoral or border leagues required the action of both the Federal and State authorities, according to tire laws of Mexico and of tiro Slate of Coa-linila and Texas. So far we have thought we could go in exx>ouuding (he laws applicable to (hose lands. But where there had been a contestas to which had the superior claim to the bounty of the Government, and it had been decided between the conflicting claimants, we never have claimed the right to revise the correctness of the decision of tlie former political or judicial authorities of this country before the revolution.
It may lmvc been without any authority of law that General Toran instituted an inquiry and forwarded to the Federal Executive a memorial in relation to tlie controversy. lie seems to have grounded his right to interfere upon the fact that it belonged to'him, because that the lands'were within the littoral leagues, and were therefore at tlie entire disposal of the Federal Government. It is clear, however, that the Federal Executive did not, on liis representation, undertake to grant tlie possession to De Leon, but only communicated a preference for him ; and if the proceedings had stopped with tlie announcement of a preference, we would have been withontovidcnce of tlie concurrence of file State Government, and the issuance of a grant by the letter to Sandies would liave been a nullity, and lie would have had no title to convey. We have seen, however, that it did not stop here, hut that the State Government proceeded to award in favor of De Leon, and caused, by its authority, the titles to he extended to the colonists of De Leon.
If, however, the decision of tlie conflicting claims between De Leon and Power was subject to our revision, we would liot feel authorized upon the facts of this ease to annul what-had been done under the former sovereignty in reía- , tion to this matter, because that one of tlie contestants having withdrawn from the contest, left it to the other (o exercise all the powers claimed by the rightful owner of the disputed territory. And we could not disturb rights that grew up under that adjustment without destroying the titles of innocent grantees who had reposed in security upon the right of De Leon to have titles extended to them. Under such circumstances, we would presume that the decision in DeLeon’s favor had been sustained by proof that had been lost and not now accessible to us. In' general, wc would regard tlie acts of the former sovereignty not subject to revision; and it would require a clear case of usurpation, without any authority of law, to make the exception. (See Holliman’s Heirs v. Peebles, 1 Tex. R., 709.) And here the very judicious remarks of Judge Arrington, of the 12lh judicial district, seem to he so appropriate as to justify their insertion.
“It is objected, however, that the land, previous to 1820, was the property of “ private owners, and that it was taken for exidos, without compensation, in “ violation of the Constitution of Tamanlipas. Supposing that to lie true in “fact, although it is denied, can it he even imagined that tlie courfs of the “ new sovereign will undertake to revise the acts of a former Government as “ being in conflict with its organic law? Besides, as the Supreme Court of “ Texas has said, the interpretation of the Constitution in Mexican States is “ strangely confided to tlie legislative and not, as with us, to the judicial “ power. Our courts do not occupy the attitude of tribunals of appeal or error “in relation to irregularities committed by the former authorities of Tamau- “ lipas. We cannot afford to resuscitate and rake from the tomb of oblivions “years the forgotten controversies so long gone by.” (Ex parte District Attorney, Brownsville, November, A.D. 1852.)
The conclusion to which we have arrived is, that the contract of Martin De Leon authorized him to colonize the coast leagues between the Lavaca and the Guadaloupe and in the fork of the Coleto and the Gnadaloupe, and that the commissioner of that colony was legally authorized to extend titles to the colonists of the said De Leon, within those boundaries.
The second objection to the reading the grant to Sandies as evidence to the *293 jury is, that tlie authority oí Fernando De Deon as commissioner is not shown, nor is it shown that Sanches had been received as a colonist in De Leon’s colony. The appointment of Fernando De Leon to the office of commissioner for the colony is shown by copies of tlie archives of the General Land Office, duly authenticated by the Spanish translator and the general commissioner of that office, and it was proven by oral evidence that he acted in and discharged the duties of that office; the presumption is, therefore, that he was legally appointed. It does not, however, rest upon presumption; because the documentary evidence shows that he had been appointed by the legally-constituted authority for making the appointment. The proof is, therefore, plenary, and not merely presumptive, as it would have been if it had not been sliown'that in his appointment the. requirements of the law had been strictly observed.
It is contended tiiat there is no evidence that Maximo Sanches had ever been received as one of De Leon’s colonists; that there is no proof that Placido Venebides, who reported in favor of Sanches as possessing the requisite qualifications, was tlie empresario ad interim, as lie styles himself.
Tlie petition to tlie commissioner for title is in the usual form; tlie grounds upon which petitioner rests his claim are that he is one of the colonists introduced by tlie empresario, Martin De Leon; tiiat lie is a married man, possesses the requisite qualifications; alleges that lie has never received title, and prays for a grant of one sitio, describing its location. This petition, is referred to citizen Placido Venebides, empresario ad interim, for his report whether tlie matters of the petition are true, to which there is a report signed by Vene-bides as empresario, stating that petitioner had been introduced by his predecessor, Martin De Leon, empresario. Tlie surveyor is ordered by the commissioner to make the survey prayed for, which is made and returned by the, surveyor to the commissioner, who then proceeds to extend the title in the usual form. The question arises on the fact tiiat Venebides is called and calls himself the empresario ad interim. Parol evidence shows tiiat Martin De Leon had dial before tiiat time, and that Venebides was the acting empresario to carry out the enterprise. There, is, however, no evidence to show when or by what authority he was constituted empresario' ad interim. It may have been by authority derived from his predecessor, or it may' have been under some municipal regulation of tlie colony. From the fact that the commissioner recognized him as occupying the position, the inference would bo that it was by lawful tenure until tlie contrary was proven. The commissioner, under a colonization contract, holds his office independent of the empresario, directly from the Government. And it is not reasonable to suppose tiiat lie would have acknowledged Venebides as the empresario for the time, if it had been self-assumed, without any authority for so doing. The presumption that Vene-bides may have been the legal representative of Martin De Deoil acquires, perhaps, some additional strength from tlie fact that these empresario contracts for colonization were not unfrequently transferred, and the transfer recognized by the Government; and it would seem to follow tiiat, if De Leon could have made an assignment of his contract, lie could have disposed of it by testament, or that it was such-a light as could have been and was perhaps administered upon as a portion of tlie rights pertaining to his succession. If we believed that, the reference to and tlie report oí tlie empresario was a necessary' element, constituting a valid title by the commissioner, we would have had to decitle'how far such presumption ought to prevail in favor of tlie action of the empresario ad interim; but we do not believe that the law required such reference, and its being practiced was at most only' matter of form.
As before said, the commissioner under the colonization law held liis office independent of the empresario, from the State Government, and he was clothed with very considerable powers in the extension of titles; and, with one solitary exception, lie judged for himself of the sufficiency of the qualifications of a colonist to receive title to tlie land petitioned for. He, besides, had authority' vested in him in the civil organization and municipal Gov- *294 eminent of the colony. See the instructions to the commissioners issued from, the executive department of the State, of September 4th, 1827. (Laws Coalmila and Texas, p. 70, 71, 72, and 73.)
Note 102. — Do Leon v. White, post, 508; Kilpatrick v. Sisneros, 23 T., 113.
Note 103. — Smith v. Po\vert Id T., 146; same ease, 23 T., 29. The only recognized exception to this rule is where a title m the reserved leagues has been issued under the specific authority of a decree of the Congress of the State of Conhuila and Texas. (lBlount v. Webster, 16 T., GIG, Johnston v. Smith, 21 T., 722; Johnson v. Shaw, 41 T., 428.)
We have said that there is one exception to the authority of the commissioner to act independent of the empresario in the issuance of titles to the colonists, as to their qualifications, and that is in the case of colonists who are foreigners, and refers to the certificate they are required to produce from the authorities of the country from which they came, thereby proving themselves to be of the Christian religion and of good moral character; and in 2d article of the instructions above referred to it is enjoined upon him, “In order to guard against “false certificates, the commissioner shall admit none until after the empresa-rio, to whom they shall previously be transmitted for the purpose, shall give “information in writing relative to the legitimacy of the same.” We believe, therefore, that, unless in the case of foreigners asking to become colonists and to receive title, the commissioner could have acted upon his own responsibility, and decided without a reference to any one; and if he should seek information on the subject, he was not required to embody the information acquired nor the sources from whence obtained in the titles he extended to colonists. The title would have been valid without such information being set out in it. We believe, therefore, that the information derived from Yenebides is mere matter of surplusage, and as such it cannot vitiate the title extended to Sanches, and that title being a valid and perfect title, there was no error in permitting it to be read in evidence to the jury.'
From the views we have expressed, it is not material, as to the result of this suit, to inquire whether the court erred in the charges given and in the charges refused to be given upon the statute of limitations, because the title of the defendant having been shown by documentary evidence to be perfect and valid, the land embraced by it was not a part of the public domain, and was not subject to be located upon by the plaintiff; and that being the case, he is not prejudiced by the supposed erroneous rulings of the court on other matters. The judgment is therefore affirmed.
Judgment affirmed.